**Meyer W. SHULICK, Appellant,**

v.

**PAINEWEBBER, INCORPORATED.**

Superior Court of Pennsylvania.

Argued April 30, 1997.

Filed Sept. 17, 1997.

---

Edward Seglias, Philadelphia, for appellant.

Alan C. Kessler, Philadelphia, for appellee.

Before BECK and POPOVICH, JJ., and MONTEMURO,* Judge.

BECK, Judge:

We decide, *inter alia,* whether a customer may maintain a state common law cause of action for breach of fiduciary duty and breach of contract against a securities broker arising out of inadequate disclosure of order flow payments or whether such action is preempted by the federal Securities Exchange Act, 15 U.S.C. § 78a, *et seq.,* and relevant regulations. We hold that under the facts of this case a customer may not maintain a state common law cause of action, and therefore affirm the trial court.

The customer, plaintiff-appellant Meyer W. Shulick, filed this action against defendant-appellee PaineWebber, Incorporated (herinafter "PaineWebber"), alleging, *inter alia,* that appellee breached its fiduciary duty to

---

* Retired Justice assigned to Superior Court.

1. This action was filed by Shulick as a putative class action, "on behalf of himself and all other

appellant and other investors when it accepted "order flow payments" without permission from or adequate disclosure to them.[1] Appellee filed preliminary objections, arguing that the common law causes of action alleged by appellant were preempted by federal securities law. The trial judge granted the preliminary objections, holding that appellant's lawsuit was indeed preempted, and dismissed the action. The court relied on cases from other jurisdictions that have addressed this issue, as our courts have not. We find the reasoning in these cases compelling, and therefore affirm.

■ In determining whether the trial court properly sustained preliminary objections we must consider the legal sufficiency of the complaint and, assuming the averments of the complaint to be true, whether the plaintiff made out a cognizable cause of action. *Gordon v. Lancaster Osteopathic Hospital Assoc.,* 340 Pa.Super. 253, 489 A.2d 1364 (1985); *D'Antona v. Hampton Grinding Wheel Co.,* 225 Pa.Super. 120, 310 A.2d 307 (1973).

The complaint in this case sets forth the following factual averments. PaineWebber is a national securities brokerage firm. It has executed numerous securities transactions on behalf of appellant Shulick for which it has received payments, credits or other forms of remuneration commonly referred to as "order flow payment." When a client authorizes a securities transaction, PaineWebber directs or routes the order to a particular exchange, wholesale dealer or market maker for execution. In an effort to attract the order, the exchanges, wholesale dealers or market makers give PaineWebber a payment, credit, compensation, rebate, remuneration, fee reduction, clearance, consideration or other orders or inducements having an economic value. This "order flow payment" provides broker-dealers with economic incentives to place orders with one particular exchange, dealer or market maker over another.

individuals similarly situated", but there is no indication that class certification was ever actually obtained before the action was dismissed.

■ Appellant claims that these order flow payments were not adequately disclosed to him, that he did not consent to their retention by PaineWebber, and that Paine-Webber breached its fiduciary duty to him and other investors by concealing the details of these order flow payment transactions. Appellant argues that, because of the influence of order flow payments on the broker's actions, the investors do not receive the "best execution" possible on their securities transactions. Appellant also asserts that Paine-Webber breached its fiduciary duty and duty of loyalty to and its contract with its investors.

Appellant seeks an accounting of all monies received by appellee during the relevant transactions, payment of damages for the value of the order flow payments received, attorneys' fees and costs, and a return of all commissions earned by appellee during transactions that violated appellee's fiduciary duty and duty of loyalty to its investors.

Since 1977, federal securites regulations have required that a broker acting as an agent for a customer disclose on a "trade confirmation" slip sent to the customer after a trade:

> the source and amount of any other remuneration received or to be received by him in connection with the transaction; provided, however, that ... the written notification may state whether any other remuneration has been or will be received and that the source and amount of such other remuneration will be furnished upon written request of such customer.

17 C.F.R. § 240.10b–10 (a)(8)(iii). These disclosure requirements were proposed by the

SEC as " 'a uniform rule applicable to all who wish to effect transactions for or with investors.' " *Guice v. Charles Schwab & Co.*, 89 N.Y.2d 31, 39, 651 N.Y.S.2d 352, 674 N.E.2d 282 (1996) (citing Securities Confirmations Proposed Rule, SEC Exchange Act Release No. 12806).

By 1995, the SEC had rejected efforts to eliminate the practice of order flow payments,[2] and instead revised Rule 10b–10 to require that "at or before completion of [a securities] transaction," the broker must:

> give[ ] or send[ ] to [the] customer written notification disclosing ... whether payment for order flow is received by the broker or dealer for transactions in such securities and the fact that the source and nature of the compensation received in connection with the particular transaction will be furnished upon written request of the customer....

17 C.F.R. § 240.10b–10 (a)(2)(i)(C). Another provision added in 1995 requires that brokers disclose the:

> broker's or dealer's policies regarding receipt of payment for order flow ..., including a statement as to whether any payment for order flow is received for routing customer orders and a detailed description of the nature of the compensation received.

17 C.F.R. § 240.11Ac1–3 (a)(1).[3] All along, however, the SEC has declined to require disclosure of dollar amounts for order flow payments because it would "impose 'an extreme burden' upon broker-dealers 'to determine the amounts received from each order in time for a confirmation' and would entail expenses disproportionately high in relation to the potential benefits to customers."

**2.** The SEC explained its decision by reasoning that "the practice did not necessarily violate a broker-dealer's best execution obligation, and that the practice benefitted the securities industry in lowering execution costs, in facilitating technological advances in retail customer order handling practices and in enhancing competition among broker dealers and the various exchange and nonexchange securities markets and, thus, also worked to the advantage of investors." *Guice, supra* at 43, 651 N.Y.S.2d 352, 674 N.E.2d 282.

**3.** Appellant argues that the 1995 amendments represent Congress's first effort to regulate order

flow payments and that the earlier version of § 10b–10—referring generally to "remuneration"—did not apply to order flow payments. He claims that his lawsuit therefore is not preempted because the relevant securities transactions took place before 1995, before order flow payments were expressly governed by federal regulations. First of all, we do not see where in his complaint appellant specified when the challenged transactions took place. Nonetheless, we find this argument to be meritless, since the term "remuneration" may clearly be held to apply to order flow payments.

*Guice, supra* at 43, 651 N.Y.S.2d at 358, 674 N.E.2d at 288 (citing Payment for Order Flow, SEC Exchange Act Release No. 34–34902, reprinted in 59 Fed.Reg. 55006).

Therefore, it is clear that the practice of receiving payment for order flow has been considered by federal authorities and remains legal. The question is whether a common law cause of action for breach of fiduciary duty and breach of contract arising out of "inadequate disclosure" of these payments, or for failure to obtain consent of the investors to the broker's retention of such payments, may lie in light of these federal regulations. We agree with the trial court that it may not, and hold that appellant's lawsuit is impliedly preempted by federal law.

We have recently summarized the law on federal preemption:

Speaking generally on the subject of preemption, the United States Supreme Court stated in *Cipollone v. Ligget [Liggett] Group, Inc.,* 505 U.S. 504 [112 S.Ct. 2608, 120 L.Ed.2d 407] (1992):

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art VI, cl. 2. Thus, since our decision in *McCullough v. Maryland,* 4 Wheat. 316, 427, 4 L.Ed. 579 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114 [2128–29], 68 L.Ed.2d 576 (1981). Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146 [1152], 91 L.Ed. 1447 (1947). Accordingly, " '[t]he purpose of Congress is the ultimate touchstone' " of preemption analysis. *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185 [1190], 55 L.Ed.2d 443 (1978) (quoting *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219 [223], 11 L.Ed.2d 179 (1963)).

Congress' intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305 [1309], 51 L.Ed.2d 604 (1977). In the absence of an express congressional command, state law is preempted if that law actually conflicts with federal law, *see Pacific Gas & Elec. Co. v. [State] Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713 [1722], 75 L.Ed.2d 752 (1983), or if federal law so thoroughly " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " *Fidelity Federal Savings & Loan Assn. v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014 [3022], 73 L.Ed.2d 664 (1982) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. at 230, 67 S.Ct. [at 1152] 1146, 91 L.Ed. 1447). *Cipollone,* 505 U.S. at 516 [112 S.Ct. at 2617]. Thus, federal preemption of state law can occur in three types of situations: where Congress expressly preempts state law, where preemption is implied because Congress has occupied an entire field, and where preemption is implied because there is an actual conflict between federal and state law. *Pokorny [v. Ford Motor Co.],* [902 F.2d 1116,] 1120 [ (3d Cir.1990) ](citing *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988)).

*Cellucci v. General Motors Corp.,* 450 Pa.Super. 438, 676 A.2d 253 (1996), *appeal granted,* 546 Pa. 652, 684 A.2d 555 (1996).

■ An award of damages in a common law action can have the same regulatory effect as an affirmative legislative enactment and therefore may be subject to preemption by federal law. *Cellucci, supra.* See also *International Paper Co. v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (granting compensatory damages for conduct permitted by federal law is a form of regulation subject to preemption). *Compare O'Donnell v. Big Yank,* 696 A.2d 846 (Pa.Super.1997) (where federal law establishes a

"standard or other regulation" different from standards established by a "State or political subdivision of a State," a common law negligence action is not preempted).

Here, there is no express preemption, and the savings clause included in the Securities Exchange Act indicates that Congress did not intend to occupy the entire field of securities regulation:

> The rights and remedies provided by this chapter shall be *in addition to any and all other rights and remedies that may exist at law or in equity;* Nothing in this chapter shall affect the jurisdiction of the securities commissions (or any agency or officer performing like functions) of any State over any security or any person *insofar as it does not conflict with* the provisions of this chapter or the rules and regulations thereunder.

15 U.S.C. § 78bb(a) (emphasis added). Thus common law remedies appear to remain viable under the federal legislative scheme as long as they do not "conflict" with the provisions of the federal law.

Section 10b–10 describes the extent of disclosure required by brokers who receive "remuneration" of any kind from exchanges or other market makers as the result of securities transactions they execute on behalf of investors. Appellant has not alleged that PaineWebber failed to comply with these requirements. Instead, appellant essentially argues that this disclosure was not adequate to protect his interests, despite its compliance with federal regulations.

We conclude that preemption is implied because the claims for relief asserted by appellant create a conflict between federal and state law. The additional regulations that appellant seeks to impose on a broker-dealer under Pennsylvania common law disturb and disrupt the federal regulatory scheme and thus run counter to the objectives of Congress in enacting the regulatory scheme. We are persuaded by the rationale set forth by the Court of Appeals of New York, in *Guice, supra:*

> [P]ermitting the courts of each State to enforce the ... common-law agency standards of disclosure on the practice of order flow payments in civil damage actions

would unavoidably result in serious interference with the "accomplishments and execution of the full purposes and objectives of Congress" (*Hines v. Davidowitz* [312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)]) in enacting the 1975 amendments, and would directly conflict with SEC regulations limiting the disclosure requirements regarding receipt of order flow payments to less exacting, post-transaction information on customer confirmation statements and disclosure of general policies of the broker on initial and annual customers' account statements.

89 N.Y.2d at 45, 651 N.Y.S.2d at 359, 674 N.E.2d at 289. *See also Dahl v. Charles Schwab & Co.,* 524 N.W.2d 742 (Minn.App. 1994) (action seeking to require consent of investor for receipt by broker-dealer of order flow payments preempted by federal law). Appellant seeks to impose additional requirements on broker-dealers such as appellee which would conflict with the regulation scheme enacted by Congress. This regulation scheme was enacted in part for purposes of uniformity. We therefore hold that appellant's lawsuit is preempted by section 10b–10 of the SEC regulations, and that the lower court properly sustained appellee's preliminary objections.

Order sustaining preliminary objections affirmed.